UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IRENE M. ROBERTS,

        Plaintiff,

       v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 17-cv-00307-JCS

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 23, 26

## I.    INTRODUCTION

Plaintiff Irene Roberts brings this action appealing the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), denying Roberts's application for disability benefits. The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, Roberts's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for an award of benefits.[1]

## II.    BACKGROUND

Because Roberts's motion and the Court's decision turn primarily on Roberts's limited use of her right hand, the summary of the record and arguments below focuses on that issue, as addressed by the parties and the ALJ, and is not intended as a comprehensive description of the administrative record, the ALJ's decision, or Robert's medical history.

### A.    Roberts's Medical Records

On May 1, 2013, an x-ray was taken of Roberts's right hand based on her complaints of pain in her right thumb and index finger since a wrist injury around Christmas of 2012. *Id.* at

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

503–04.  Doctors who reviewed the x-ray found no evidence of an acute bony fracture, subluxation or dislocation, or a radiopaque foreign body.  *Id.* at 419, 504.

In July of 2013, Roberts visited Dr. Constance Lo at the Santa Clara Valley Medical Center for edema, apparently of her feet or legs.  *Id.* at 491.  Among other complaints—including that she could not stand for more than five minutes due to back pain—Roberts complained of pain in her right wrist since around Christmas of 2012 due to an injury when she tried to push off from sitting on the floor and her wrist buckled.  *Id.* at 262, 463, 492.  A test for tendon injury was equivocal.  *Id.* at 493.  Dr. Lo ordered that Roberts visit the "Hand Therapy Clinic," communicate with a nurse, and try a "velcro thumb spica splint during night and day if possible."  *Id.* at 263, 464, 493.

Also in July of 2013, Roberts visited a clinic for a follow-up visit related to a cyst on her jaw.  *Id.* at 247.  Surgery had been attempted in 2012 but aborted due to heart problems.  *Id.*  A report from the clinic visit states that the cyst was asymptomatic at that time, and that Roberts's "history of coronary artery disease and asystole, ma[de] operative intervention excessively risky." *Id.*  A note from 2014 describes those surgery complications in more detail.  *Id.* at 558.  After an incision was made and surgeons prepared to cut into her bone, Roberts "went into asystole with a complete drop of blood pressure on the A-line and desaturation down to 40%."  *Id.*  Doctors "were about to commence chest compressions and inject atropine when [her] heart rate returned to 40." *Id.*  According to another description from the same 2014 record—whether this describes the same incident is not entirely clear—Roberts "received one chest compression and no medications before recovering."  *Id.*; *see also id.* at 256–57, 259.  Roberts reported that her heart had also stopped twice in April of 2011.  *Id.* at 558.

Notes from Dr. Lo dated September 6, 2013 indicate that Roberts had chronic low blood pressure, swelling of her feet, and some back issues, among other issues.  *Id.* at 401.  Those notes do not discuss Roberts's hand or wrist.  *Id.*

On September 19, 2013, Roberts visited Dr. Darrell Corben, MD for an examination.  *Id.* at 447–453.  Dr. Corben's report lists Roberts's "chief complaints" as: (1) "Chronic shortness of breath"; (2) "Chronic low back pain"; and (3) "Right wrist carpal tunnel syndrome."  *Id.* at 449.

Roberts reported to Dr. Corben that she had symptoms related to carpal tunnel syndrome for approximately fifteen years, that she occasionally dropped objects and frequently had "a burning pain sensation in her right wrist and forearm," and that she had declined to undergo surgery because it "could potentially worsen her condition." *Id.* at 449–50. Roberts exhibited symmetric bilateral grip strength at "5/5." *Id.* at 452. Dr. Corben determined that Roberts was "capable of reaching, handling, fingering, and feeling for up to three hours per day as long as provision was made for [her] to take periodic rest breaks as needed in order to mitigate any symptoms related to wrist pain." *Id.* at 453.

Dr. Corben also noted that Roberts was "wearing a right wrist spica splint status post a recent thumb tendon injury" twenty-four hours a day at the time of the examination, but that he considered limitations caused by the splint to be "a self limited state as full recovery is anticipated," and that he expected that she would not need the splint "beyond the next few months." *Id.* at 450, 451. Separate from Roberts's hand issues, and thus of limited relevance to the outcome of the present motions, Dr. Corben also discussed Roberts's back and heart issues. *See id.* at 449–53.

Roberts had a routine follow-up visit to the Santa Clara Valley Medical Center in January of 2014, where she reported that she would become short of breath walking from her car to the grocery store, and thus needed to park closer to the store than she had in the past. *Id.* at 470. Notes from that visit to not mention Roberts's hand or wrist. *See id.* Notes from another visit in May of 2014 focus on Roberts's back pain and also do not mention her hand or wrist. *Id.* at 546–49.

A report from a July 17, 2014 physical therapy session indicates that Roberts experienced increased pain from standing for more than five or ten minutes, walking more than five minutes, or sitting more than thirty minutes, assessed Roberts as able to stand and walk short distances "with much difficulty," and recommended that she use a "cane as needed to avoid aggravating symptoms." *Id.* at 551, 553–54. The physical therapist set a goal for Roberts to be able to stand for twenty minutes to cook a meal after eight weeks of therapy. *Id.* at 554–55. The therapy session does not appear to have been focused on Roberts's hand, but notes in her list of symptoms

a "[r]ight hand injury secondary to FOOSH [i.e., fall on outstretched hand]: 2012 - difficulty with gripping/grasping techniques." *Id.* at 551.

At another physical therapy session on August 6, 2014, Roberts reported pain after her previous session at a level of eight out of ten that made it difficult for her to leave the house. *Id.* at 564. A report from mid-August reports "no significant progress." *Id.* at 567. On August 27, 2014, near the end of her course of physical therapy, Roberts had not met the goal of being able to stand for twenty minutes and instead could only stand for five minutes. *Id.* at 570. Physical therapy reports after Roberts's first session do not discuss her hand. *Id.* at 516–18, 555–57, 564–70.

Notes by Dr. Gina Yukiko Fujikami, MD, from an early September 2014 visit where Roberts's symptoms included lower back pain and right wrist pain, indicate that Roberts's back pain was worsening and Tylenol, physical therapy, and Icy Hot had not helped significantly, but "[h]eat helps a little." *Id.* at 510–11. Dr. Fujikami's notes nevertheless called for Roberts to continue with Tylenol, physical therapy, hydrotherapy, and warm compresses. *Id.* at 510. Dr. Fujikami noted that Roberts had experienced worsening pain and weakness in her right hand since her injury in December of 2012, but did not experience numbness or tingling. *Id.* at 512, 515. Tinel's test and Phalen's test—used to detect carpal tunnel syndrome—were negative. *Id.* at 514. Dr. Fujikami ordered an MRI of Roberts's right hand. *Id.* at 510, 515.

In records of a telephone conversation with Roberts in October of 2014 regarding Roberts's request for an MRI of her back, Dr. Constance Lo noted that "[s]ince [Roberts] has been told that she may not have surgery by her cardiologist, the MRI would not necessarily change management." *Id.* at 526. Roberts told Dr. Lo that a relative who is a doctor encouraged her to have an MRI, and that she also believed she needed it for her Social Security application. *Id.* Dr. Lo noted that Roberts's back pain had "[d]ramatically gotten worse over [the] last year." *Id.*

Notes by Dr. Peter Gregor, MD dated October 22, 2014 indicate that Roberts was limited by lower back pain and that her gait required use of a cane. *Id.* at 521. Dr. Gregor did not discuss Roberts's hand or wrist, and his notes appear to focus primarily on Roberts's heart issues. *See id.* at 521–25.

Roberts had MRI imaging of her back and hand taken on February 17, 2015. *Id.* at 584–86. The images of her back revealed mild to moderate disc protrusion contacting a nerve root, as well as moderate degenerative changes. *Id.* at 585. Notes related to the MRI of Roberts's hand indicate that she had experienced pain in her thumb and wrist for two years with neuropathy and discomfort. *Id.* That MRI revealed "joint space narrowing, subchondral cyst formation, and marginal osteophytes at the first MCP and first CMC joints . . . compatible with severe osteoarthritis." *Id.* at 586. The MRI also showed "a cystic structure at the proximal pole of the scaphoid, which may be related to prior injury of the scaphoid ligament," but the conclusions note that "this exam is not tailored for this evaluation." *Id.* Roberts's "[m]edian and ulnar nerves appear[ed] intact." *Id.*

On February 20, 2015, Dr. Lo called Roberts to discuss the results of her MRIs. *Id.* at 583. Dr. Lo noted that Roberts had been told she could not have surgery, and recommended "conservative treatment and symptom control for both back and hand." *Id.* at 583.

### B. Initial Denial of Application

Roberts applied for benefits on June 27, 2013, AR at 145, and listed the following impairments on her disability report: (1) "Coronary artery disease, high blood pressure"; (2) "Coronary artery disease"; (3) "Previous myocardial infarction"; and (4) "High blood pressure." *Id.* at 162. The disability report did not mention Roberts's hand or wrist. *See id.*

The Commissioner initially denied her application in October of 2013, concluding that she was capable of performing her past work as a manager. *Id.* at 52–62. At this stage of her application, Roberts had relied primarily on her heart condition as the reason for disability. *Id.* at 57. The decision includes a note that Dr. Corben's restrictions on Roberts's use of her hand did not "appear supported," and assessed a more moderate limitation of no more than "frequent" handling and fingering due to carpal tunnel syndrome. *Id.* at 56, 59, 67, 70. The decision also notes that Roberts stopped working "because she didn't need to work because her [then] husband made good money." *Id.* at 57. On reconsideration, the Commissioner once again found Roberts to be not disabled in February of 2014, with a consulting doctor again determining that she could engage in frequent handling with her right hand. *Id.* at 84.

Roberts's appeal for an administrative hearing, which she completed in April of 2014, states that she could complete "light chores but it takes 3 times as long to complete." *Id.* at 218. The appeal does not specifically mention her hand or wrist. *See id.*

### C.    Administrative Hearing

Administrative Law Judge Brenton Rogozen (the "ALJ") held a hearing on March 25, 2015. *See* AR at 34. The ALJ confirmed Roberts's address and birth date, and in response to his questions Roberts testified that she lives with her mother, has a driver's license, and drives, and that she last worked in March of 2002. *Id.* at 35–36. The ALJ then turned the hearing over to Roberts's attorney at the time, Cynthia Starkey. *Id.* at 36.

In response to Starkey's questions, Roberts testified that she completed high school but only attended college for six months and did not complete any courses. *Id.* From 2000 to 2002, Roberts worked as an assistant manager for AT&T, which required extensive use of her hands for typing for approximately ninety percent of her twelve- to fourteen-hour workdays. *Id.* at 37–38. Roberts lost her job when AT&T closed her department in 2012, and she was unable to find comparable work. *Id.* at 38.

Roberts applied for disability benefits in June of 2013 based primarily on lower back pain but also on impairments related to her hands. *Id.* She testified that her back pain is constant and rates as an eight or nine on a scale of one to ten. *Id.* at 39. Roberts cannot stand up for more than five or ten minutes at a time, nor can she sit for long periods. *Id.* at 38. She is most comfortable when lying down, but even then experiences pain and "can't lay down all the time either," and instead needs to sit and stand from time to time. *Id.* at 39. She lies down for one or two hours in the middle of the day because "it's exhausting being in pain all the time," and sometimes she sleeps during the day because her medications cause drowsiness. *Id.* at 40, 43. The Tylenol that Roberts takes for her pain is not helpful, and she testified that her doctors were not able to operate on her because "when they put [her] under for surgery [her] heart stops," for reasons that the doctors have not determined. *Id.* at 40. At the time of the hearing, Roberts had used a cane for about eight months, even in her home, to relieve some of the pressure on her back. *Id.* at 41–42.

Roberts is right-handed and experiences pain from osteoarthritis in her dominant hand

United States District Court
Northern District of California

from her thumb to her wrist, extending up her arm when she is writing or performing similar activities. *Id.* at 40–41. Her only treatment is pain medication and a brace prescribed by Dr. Lo, Roberts's primary care doctor. *Id.* at 41. The brace reduces Roberts's pain by keeping her hand stable and preventing her from accidentally applying pressure to her hand, "which would cause a lot of pain." *Id.* At the time of the hearing, Roberts had used the brace for approximately one year. *Id.* at 42.

Roberts also experiences chest pain and "a fluttering of [her] heart" where its "beat is off." *Id.* She becomes short of breath or is unable to catch her breath sometimes, both with and without exertion. *Id.* She has difficulty sleeping through the night and has been told that her heart stops during the night. *Id.* at 43–44.

Roberts survives on food stamps and general assistance. *Id.* at 42. She spends her day walking around the house, fixing tea for herself and her mother, and reading.[2] *Id.* Her sister takes her grocery shopping, and she cooks a "little bit," but with difficulty due to her inability to use her right hand without pain. *Id.* at 43. Cooking and cleaning dishes takes her two to three times as long as it used to, and sometimes her right hand swells up and she needs to ice it. *Id.* There are some meals that Roberts no longer cooks because they take too long or cause too much pain. *Id.*

After Roberts's attorney completed her questions, the ALJ resumed questioning Roberts and asked her to clarify how long she had been living with her mother, to which Roberts responded that she had been living there since January of 2008, rather than 2013 as stated in her application for benefits. *Id.* at 44–45. Roberts had been married before then and lived in Livermore, California. *Id.* at 45.

Roberts testified that MRIs had been taken of her back and hand, and her attorney directed the ALJ to the relevant exhibit in the record. *Id.* (discussing AR at 586). Roberts's doctors did not explain to her why she had arthritis in her thumb but not in other fingers. *Id.* The only other

---

[2] The transcript of the hearing indicates that Roberts testified: "I real [sic] a lot, not a whole lot I can do." AR at 42. In context, "real" appears to be a typographical error intended as "read," but the interpretation of this testimony is not material to the outcome of the present motions. *See also id.* at 22 (ALJ's decision, stating that Roberts "claimed she did little throughout the day except for reading and walking around the house").

1    test performed on Roberts's hand besides the MRI was an x-ray that Dr. Lo had ordered in May of

2    2013. *Id.* at 45–46.  When Dr. Lo failed to prescribe medication or take other action after the x-

3    ray, Roberts saw another doctor who was filling in for Dr. Lo, who then ordered the MRI.  *Id.* at

4    46–47.

5         In response to follow-up questions from her attorney, Roberts testified that she did not

6    recall a doctor telling her to elevate her legs, and that she elevates her legs when she is lying down

7    but not when she is sitting.  *Id.* at 47.  Roberts has not been satisfied with Dr. Lo's treatment of her

8    in the years that Dr. Lo has been her primary care doctor.  *Id.*

9         The ALJ then questioned Darlene McQuary, a vocational expert (the "VE").  *Id.* at 48–49.

10   The VE testified that Roberts's past work with AT&T would be classified as a "project manager"

11   under the Dictionary of Occupational Titles ("DOT"), number 189.117-030.  *Id.* at 48.  As listed,

12   the job is sedentary with an SVP of 8, but the VE changed the SVP to 7 because Roberts was an

13   assistant manager.  *Id.*  The entry in the DOT calls for occasional fingering, but because the entry

14   had not been updated since 1981 and the use of computers has become ubiquitous in the years

15   since then, the VE determined that Roberts's past work would have required "close to constant

16   rather than occasional" fingering, and other project manager positions would require "at least

17   frequent" fingering.  *Id.* at 49.

18        Roberts's attorney asked the VE whether a person who could only use their hands for three

19   hours out of the day and would "need to take periodic rest periods as needed" would be able to

20   perform the job of a project manager, and the VE testified that such a person would not.  *Id.*

21   Asked whether "there [would] be any other transferable skills," the VE answered in the negative.

22   *Id.*

23        **D.    Regulatory Framework for Determining Disability**

24        The Commissioner uses a "five-step sequential evaluation process" to determine if a

25   claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ must determine if the

26   claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  If so, the

27   ALJ determines that the claimant is not disabled and the evaluation process stops.  If the claimant

28   is not engaged in substantial gainful activity, then the ALJ proceeds to step two.

At step two, the ALJ must determine if the claimant has a "severe" medically determinable impairment. An impairment is "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment, then the ALJ will find that the claimant is not disabled. If the claimant has a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ compares the claimant's impairment with a listing of severe impairments (the "Listing"). *See* 20 C.F.R. § 404, subpt. P, app. 1. If the claimant's impairment is included in the Listing, then the claimant is disabled. The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. If a claimant's impairment does not equal a listed impairment, then the ALJ proceeds to step four.

At step four, the ALJ must assess the claimant's residual function capacity ("RFC"). An RFC is "the most [a person] can still do despite [that person's] limitations" caused by that person's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a person] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the person] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, then the ALJ finds that the claimant is not disabled. If the claimant is unable to perform past relevant work, then the ALJ proceeds to step five.

Normally, at step five, the burden shifts from the claimant to the Commissioner. *Johnson v. Chater*, 101 F.3d 178, 180 (9th Cir. 1997). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

In the special circumstances of a claimant who is at least fifty-five years old, restricted to sedentary work, has no transferable skills, and has not recently completed vocationally relevant

education, the Commissioner generally looks only to whether the claimant can perform the claimant's past work, without considering the availability of other work. 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d). If such a claimant cannot perform past work, the claimant is disabled. *Id.*

### E. The ALJ's Decision

The ALJ determined that Roberts had not engaged in substantial gainful activity since the date of her application in 2013, and that she had the following severe impairments: (1) "prior history of inferior wall ischemia and cardiac arrhythmia"; (2) "history of coronary artery disease"; (3) hypertension; (4) obesity; (5) lower back pain; and (6) "right thumb dysfunction with history of right carpal tunnel syndrome." AR at 21. The ALJ also briefly determined that Roberts's impairments did not meet or equal any listing in the Adult Listing of Impairments, specifically rejecting Listings 1.02, 1.04, 4.04, 4.05, 4.11, and 4.12, as well as "the criteria for the musculoskeletal, respiratory, and cardiovascular impairments under Listings 1.00Q, 3.00I, and 4.00F." *Id.* at 21–22.

In assessing Roberts's residual functional capacity, the ALJ acknowledged that he was to follow a two-step procedure, first determining whether Roberts had medically determinable impairments that could reasonably be expected to produce her pain or other symptoms, and then considering the credibility of any statements as to the intensity, persistence, and limiting effects of those symptoms to the extent those qualities cannot be established by medical evidence alone. *Id.* at 22. The ALJ described Roberts's symptom testimony as follows:

> The claimant is an individual approaching retirement age who initially alleged disability due to coronary artery disease, hypertension and residuals from a previous myocardial infarction. At the hearing, however, the claimant testified that she could no longer work mainly because of back pain and right thumb pain that radiated to her wrist. She asserted the pain was constant in her back; she rated its severity at an 8 or 9 on a scale of 1 to 10. She said it limited her ability to be on her feet for more than 15 minutes at a time.[3] She said she had to lie down about one or two hours per day, change her position frequently, and use a cane when ambulating even short distances in her home because of the back pain. The claimant maintained that she had trouble gripping objects with the dominant right hand. She confirmed that she had not undergone surgery for her

---

[3] This is a minor discrepancy, but Roberts in fact testified that she could not stand for more than five or ten minutes at a time. AR at 38.

> back or hand and was only taking oral pain medications that reportedly did little to relieve pain. She said she had been wearing a right wrist brace for about one year and using the cane for about eight months. The claimant admitted that a doctor did not prescribe her the cane. In addition to her orthopedic issues, the claimant also endorsed occasional chest pains, palpitations and shortness of breath even without exertion. As for her activities of daily living, she claimed she did little throughout the day except for reading and walking around the house, but she acknowledged she could shop for groceries with her sister, do simple chores and cook some meals.

*Id.* at 22.

The ALJ determined that Roberts's medically determinable impairments could reasonably be expected to cause her symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are less than fully credible because those allegations are greater than expected in light of the objective evidence of record." *Id.* at 23. According to the ALJ, "the evidence supports a finding that the claimant is able to perform work within the residual functional assessment" of "sedentary work as defined in 20 CFR 416.967(a) except reaching, handling and fingering is limited to frequent." *Id.* at 22, 23.

To support that conclusion, the ALJ summarized Roberts's medical history, noting that although he reviewed and considered evidence from before the date of her application, he would not discuss that evidence "in detail due to its limited relevance for the period at issue, which is June 27, 2013 through" his May 21, 2015 decision. *Id.* at 23. The ALJ began by noting that Roberts was hospitalized in 2012 "following a severe bradycardia and brief asystole which occurred while she was under surgery to remove a mandibular cyst." *Id.* He acknowledged that Roberts's pre-operation evaluation identified various cardiovascular issues and that the surgery was aborted, but stated that she "recovered without incident" and that she "has not suffered further cardiovascular deficits or acute symptoms since the surgical event." *Id.*

Next, the ALJ discussed Roberts's July 2013 examination, which in relevant part revealed "tenderness of the left lumbar paraspinal muscles, but . . . full range of motion of the back, albeit with pain," and "mild tenderness to palpitation over the right thumb, second MT area and right radial wrist, as well as pain in the right thumb with resisted extension." *Id.* The ALJ noted that a "neurological evaluation showed intact findings" and, with respect to Roberts's hand, "Finkelstein's test was equivocal" and x-ray imaging "showed no significant findings." *Id.*

11

The ALJ also discussed Roberts's September 2013 consultative internal medicine evaluation with Dr. Corben, stating that Roberts "endorsed shortness of breath, low back pain, and carpal tunnel syndrome in the right wrist," but "indicated that she had elected to forego surgery for the right hand, although it had been proposed to her." *Id.* The ALJ noted Dr. Corben's conclusions, among others, that Roberts could move without obvious difficulty, exhibited unremarkable gait and balance, had mild spams and moderate tenderness to palpation in her lower back, and would probably not need the splint on her right hand for more than a few months. *Id.* at 23–24. According to the ALJ, Dr. Corben "assessed a residual functional capacity for a range of light work, with standing and walking restricted to two hours per day," as well as "several environmental restrictions," and the state agency consultants "assessed similar limitations in their determinations." *Id.* at 24. The ALJ did not acknowledge Dr. Corben's conclusion that Roberts could only engage in "reaching, handling, fingering, and feeling for up to three hours per day" with periodic rest breaks. *See id.* at 24, 453.

The ALJ summarized Roberts's treatment in 2014, including an examination of her back midyear and her prescription for hydrotherapy in September for her hand and back pain. *Id.* at 24. The ALJ noted that Roberts had "slightly decreased grip strength on the right, but was negative for swelling and Tinel's and Phalen's signs. *Id.* The ALJ acknowledged that Roberts "was noted to require a cane" in October of 2014, but noted that there were no objective clinical findings of weakness or instability. *Id.*

The ALJ also noted that Roberts insisted on an MRI in 2014 despite her doctor's reluctance to prescribe that test. *Id.* Summarizing the results of the MRI of Roberts's wrist, which took place in 2015, the ALJ acknowledged that it "indicated joint space narrowing, subchondral cyst formation and marginal osteophytes at the first MCP and first CMC joints," but that Roberts's median and ulnar nerves appeared intact. *Id.* at 25. The ALJ did not acknowledge the note in the MRI report that the findings were consistent with severe osteoarthritis. *See id.* at 25, 586.

Because the ALJ's conclusions regarding the weight given to Dr. Corben's opinions and Roberts's testimony are central to the outcome of this appeal, several paragraphs of the ALJ's decision addressing those issues warrant reproduction in full:

1
2
3
4
5
6
7
8
9
10

In determining the claimant's residual functional capacity, the undersigned has considered but has not given great weight to the opinion of the consultative internal medicine examiner, Dr. Corben, and the determinations of the State agency medical consultants (Exs. 2A, 5A and 3F). They concluded the claimant was capable of a range of light work. These medical consultants did not have the benefit of considering the additional evidence that was available only after the reconsideration determination, including subsequent medical evidence and the hearing testimony. They particularly did not have the opportunity to consider the diagnostic evidence related to the claimant's lumbar spine and right hand. Furthermore, the State agency medical consultants did not adequately consider the claimant's subjective complaints. In further reducing the claimant's residual functional capacity to a range of sedentary work, and in assessing additional limitations, the undersigned has taken into account the recent treatment history and the benign objective findings throughout the record, as well as generously considered the claimant's subjective complaints.

11
12
13
14
15
16
17
18

The undersigned recognizes that the claimant has pain symptoms and experienced some discomfort and functional limitation due to her medically determinable impairments; however, the objective medical records indicate that the claimant has been treated for these conditions rather conservatively over the course of several years and she has responded to this treatment. Her longitudinal treatment records show no acute cardiovascular symptomatology that required hospitalization during the relevant period. The claimant has not required invasive treatment or surgery for her musculoskeletal issues, despite the findings noted in the very recent MRI studies. She acknowledged at the hearing that she was not prescribed a cane; and the records show largely intact neurologic functions with respect to her lumbar spine. There is no objective clinical evidence that she needs a cane for medical reasons. The undersigned notes that while the claimant's right hand shows degenerative changes, there is no objective evidence of carpal tunnel syndrome or other neuropathies.

19
20
21
22

While the claimant's conditions and related symptoms may cause her to have some restrictions and limitations with work-related activities, the evidence in file indicates that those limitations are not severe enough to keep her from working within the residual functional capacity assessed in this decision. The evidence as a whole at the hearing level does not support the claimant's allegations of disabling pain and cardiovascular symptoms.

23  AR at 25–26.  The ALJ concluded that Roberts's subjective complaints as to the severity of her

24  symptoms were not fully credible, and that she had not been deprived of the ability to work

25  subject to the ALJ's RFC assessment for any twelve-month period after her alleged onset date. *Id.*

26  at 26.

27         Finally, the ALJ addressed Roberts's ability to perform her past work as a project manager.

28  *Id.*  The ALJ did not mention the VE's characterization of Roberts's actual past work as requiring

13

"close to constant" handling and fingering. *See id.* at 26, 49. The ALJ did, however, credit the VE's determination that a typical present day project manager role would require use of hands and fingers "at least on a frequent basis," as opposed to only occasional use as described in the Dictionary of Occupational Titles. *Id.* at 26. The ALJ determined that Roberts's RFC would allow her to perform that work, and that she was therefore not disabled. *Id.* at 26–27.

### F. The Parties' Arguments

Roberts argues that the ALJ erred in failing to credit or even discuss Dr. Corben's opinion regarding her ability to use her hands and fingers. Pl.'s Mot. (dkt. 23) at 11–13. According to Roberts, the ALJ's stated reasons for giving limited weight to Dr. Corben's opinions—that Dr. Corben lacked access subsequent diagnostic information about Roberts's back and hand, and failed to sufficiently consider Roberts's symptom testimony—only support the ALJ's determination that Roberts was limited to sedentary work (as opposed to Dr. Corben's opinion that she could perform a wider range of light work), and do not provide any basis for rejecting Dr. Corben's opinion that Roberts was limited in her use of her hand. *Id.* at 12–13. Roberts also argues that the ALJ erred in failing to provide clear and convincing reasons for rejecting Roberts's own testimony, *id.* at 15–17, and because substantial evidence does not support the conclusion that Roberts could perform her past work, *id.* at 14–15. Roberts contends that the case should be remanded for an award of benefits under the Ninth Circuit's credit-as-true rule. *Id.* at 18.

The Commissioner argues that the ALJ properly rejected Dr. Corben's conclusions regarding Roberts's limitations in using her right hand because the subsequent MRI did not reveal nerve or tendon damage. Comm'r's Mot. (dkt. 26) at 3–4. The Commissioner also asserts that "the ALJ properly determined that Dr. Corben's own examination findings contradicted his extreme manipulative limitations," that Dr. Corben expected Roberts to recover from her thumb injury, and that treatment notes, the course of relatively mild treatment, and the state agency consultants' opinions also weighed against finding Roberts capable of less than frequent use of her hand. *Id.* at 4–6. The Commissioner argues that if Dr. Corben's opinion of Roberts's limitations is discounted, the ALJ properly determined that Roberts could perform her past work. *Id.* at 6–7.

With respect to Roberts's own testimony, the Commissioner concedes that lack of medical

14

evidence is not alone sufficient under Ninth Circuit law to discount testimony of subjective symptoms, but argues that the ALJ permissibly relied on the combination of lack of objective support, effective management through conservative treatment, and engagement in daily activities to discredit Robert's testimony regarding the severity of her symptoms. *Id.* at 7–10. Finally, the Commissioner argues that if the Court determines that the ALJ erred, the case should be remanded for further proceedings rather than for an award of benefits. *Id.* at 10–12.

Roberts argues in her reply brief that the ALJ's only stated basis for discounting Dr. Corben's opinions was that Roberts should be limited to sedentary work rather than a broader range of light work, and the ALJ did not acknowledge or specifically reject Dr. Corben's conclusions regarding Roberts's limited use of her hand. Reply (dkt. 27) at 2. According to Roberts, the Commissioner's present arguments against crediting that limitation misrepresent the ALJ's reasoning and run afoul of the rule that courts may not affirm ALJs' decisions for reasons other than those presented by the ALJ, and even on their merits do not meet the test of specific and legitimate reasons to set aside Dr. Corben's opinion. *Id.* at 3–5. Similarly, aside from the ALJ's stated conclusion that Roberts's symptom testimony was not supported by medical evidence (which alone is insufficient), Roberts contends that the Commissioner's other arguments for discrediting her testimony were not presented as such by the ALJ and do not constitute clear and convincing reasons. *Id.* at 7–8. Roberts argues that substantial evidence does not support the ALJ's conclusion and that the case should be remanded for an award of benefits. *Id.* at 6, 9.

## III.   ANALYSIS

### A.   Legal Standard

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole.

15

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely," *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014), "harmless error analysis applies in the social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). "[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (footnotes, citations, and internal quotation marks omitted).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d at 1019–21.

**B.    The ALJ Erred in Failing to Credit Roberts's Testimony**

Although the ALJ is responsible for evaluating credibility, the Ninth Circuit has formulated a two-step test for considering a claimant's testimony regarding the severity of subjective symptoms:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however,

"need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.*; *see also Reddick* [*v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)] ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins* [*v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)] ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).[4]

The ALJ found that Roberts's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and did not determine that Roberts was malingering. AR at 23. The ALJ was therefore required to "offer[] specific, clear and convincing reasons" to reject Roberts's testimony regarding the severity of his symptoms. *See Smolen*, 80 F.3d at 1281.

The ALJ's first stated reason for finding Roberts's testimony to be "less than fully credible" was that her "allegations [we]re greater than expected in light of the objective evidence of record." AR at 23. In presenting this boilerplate justification for rejecting Roberts's testimony, the ALJ disregarded the rule that "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722; *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An ALJ may not discredit a claimant's subjective testimony on that basis."); 20 C.F.R.

---

[4] The Commissioner here states an objection for the record to the Ninth Circuit's "clear and convincing" standard, but recognizes that this Court is bound by Ninth Circuit authority. Comm'r's Mot. at 8 n.8.

§ 404.1529(c)(2) (providing that the Commissioner will "not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements.").

Later in his decision, after summarizing the medical evidence, the Commissioner returned to the issue of Roberts's credibility, noting that her cardiovascular impairments did not require hospitalization during the relevant period, her musculoskeletal issues did not "require[] invasive treatment or surgery," records show "largely intact neurological functions with respect to her lumbar spine," and Roberts acknowledged that her cane was not prescribed by a doctor. *Id.* at 25. The ALJ failed to identify any particular testimony that was inconsistent with those facts. Instead, these are merely examples of areas where Roberts's testimony as to the extent of her subjective symptoms exceeded what could be determined by objective evidence alone. Having determined that Roberts's symptoms could reasonably be caused by her impairments, AR at 23, the ALJ was not free to reject testimony as to the severity of those symptoms only on the basis that such severity was not supported by objective evidence. *See Lingenfelter*, 504 F.3d at 1036; *Reddick*, 157 F.3d at 722; *Light*, 119 F.3d at 792. Moreover, even aside from that rule, none of the ALJ's stated reasons are clear and convincing. The ALJ did not explain why cardiovascular impairments would need to require hospitalization to cause shortness of breath or chest pain, why intact neurological spinal functions are incompatible with significant back pain, why it is significant that Roberts's cane was recommended to her by a physical therapist rather than a doctor, or why Roberts's doctors' instruction that she should not undergo surgery because her heart stopped under anesthesia is not a sufficient reason for foregoing such treatment. *See, e.g.*, AR at 526 ("Since [Roberts] has been told that she may not have surgery by her cardiologist, the MRI would not necessarily change management.").

With respect to Roberts's hand impairment specifically, the ALJ only "note[d] that while the claimant's right hand shows degenerative changes, there is no objective evidence of carpal tunnel syndrome or other neuropathies." *Id.* at 25. The ALJ does not explain why carpal tunnel or neuropathy would be necessary to explain Roberts's symptoms, or why such symptoms were not

18

consistent with the findings of her MRI, which were "compatible with severe osteoarthritis." *Id.*
at 586. Despite that finding on the MRI, as well as discussion of osteoarthritis by Roberts, her
attorney, and the ALJ at the administrative hearing, the ALJ's decision does not mention arthritis.

The Commissioner argues that the ALJ properly found Roberts less than fully credible
because her "condition was managed effectively by conservative treatment measures" and because
her activities of daily living were inconsistent with her testimony. Comm'r's Mot. at 9–10. The
ALJ did not present either of those as reasons for discounting Roberts's credibility, *see* AR at 22–
26, and the Court cannot affirm the ALJ's decision for reasons other than those presented by the
ALJ, *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014). The record also does not support
either of the Commissioner's assertions. With respect to management through conservative
treatment, the ALJ acknowledged that "taking oral pain medications . . . reportedly did little to
relieve [Roberts's] pain." AR at 22. Physical therapy also produced "no significant progress." *Id.*
at 567. One of the only references to even marginally effective treatment in the record is a
comment that "[h]eat helps a little." *Id.* at 510. As for Roberts's activities of daily living, the ALJ
noted that she "could shop for groceries with her sister, do simple chores and cook some meals."
*Id.* at 22. There is no evidence of how long Roberts stood while shopping with her sister (and one
note that she needed to park closer to the store because she had difficulty walking from the car, *id.*
at 470), the only "simple chore" discussed in Roberts's testimony is fixing tea, which does not
require extensive standing, exertion, or manipulation, *see id.* at 42 and Roberts testified that she
has had to limit the meals that she cooks because even simple cooking tasks cause pain and
swelling in her hand, *id.* at 43. Neither the ALJ's decision nor the Commissioner's brief identifies
any evidence of activities inconsistent with the symptoms that Roberts described.

The Commissioner erred in failing to present clear and convincing reasons for rejecting
Roberts's symptom testimony, including that she has not been able to work "because of [her]
hand," *id.* at 38, that writing for a few minutes causes pain up her arm, *id.* at 40–41, and that
performing simple cooking tasks like peeling a potato or washing a dish is difficult for her and
causes her right hand to swell and become unusable, *id.* at 43.

## C. The ALJ Erred in Failing to Credit Dr. Corben's Opinion

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.'" *Id.* (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

United States District Court
Northern District of California

*Garrison*, 759 F.3d at 1012−13 (footnote omitted).

Here, the ALJ did not address or give any explanation for failing to credit Dr. Corben's conclusion that Roberts could not engage in manipulative activities with her hand for more than three hours per day, and that she would require breaks in such activities. As stated in *Garrison*, such failure to "explicitly reject a medical opinion" by an examining physician that contradicts the ALJ's assessment of a claimant's capabilities is error. *Id.*

The Commissioner's argument that "the ALJ properly determined that Dr. Corben's own examination findings contradicted his extreme manipulative limitations" mischaracterizes the ALJ's decision. *See* Comm'r's Mot. at 4. Nothing in the ALJ's decision suggests that Dr. Corben's findings and conclusions were inconsistent, *see* AR at 23–25, and this Court cannot affirm the decision of the ALJ for reasons not presented by the ALJ. Moreover, Dr. Corben's conclusions are not contradicted by his findings, because having a full range of motion and normal grip strength is not inconsistent with Roberts experiencing pain or other symptoms after repetitive use of her hand. *See id.* at 450–53; *cf.* Comm'r's Mot. at 4.

While Dr. Corben noted his opinion that Roberts's use of a brace for tendon injury was expected to be temporary, *see* AR at 451–52; Comm'r's Mot. at 4, Dr. Corben's opinion that Roberts's *tendon* injury would heal does not negate ongoing *carpal tunnel syndrome*—one of Roberts's "chief complaints" to Dr. Corben—which is more consistent with Dr. Corben's restrictions than a temporary tendon injury requiring a thumb splint would be. *See id.* at 449–50, 453. Moreover, the ALJ did not present expected recovery as a reason for discounting Dr. Corben's opinion about the limitations caused by that impairment, which the ALJ failed to discuss at all. *See id.* at 22–26. Dr. Corben also lacked the benefit of the subsequent MRI showing joint space narrowing and other symptoms consistent with "severe osteoarthritis," *id.* at 585–86, as well as the fact that Roberts continued using a brace and complaining of hand and wrist symptoms at the time of her hearing, *id.* at 41–43, about a year and a half after Dr. Corben examined her. As for Roberts's decision not to have surgery on her hand or wrist, neither the ALJ's decision nor the Commissioner's brief explains why Roberts's concern (as stated to Dr. Corben) that surgery could worsen her condition is a reason to discredit her, *see* AR at 449, nor do they address the concern,

21

as documented throughout the record, that surgery could once again cause serious cardiac complications. *See, e.g.*, AR at 247, 256–57, 259, 526, 558.[5]

The Commissioner also cites the state agency consultants' opinions that Roberts could engage in frequent manipulation with her right hand. Comm'r's Mot. at 6. Under Ninth Circuit precedent, and ALJ must justify a decision to credit non-examining medical sources over examining medical sources. *See Garrison*, 759 F.3d at 1012–13. Here, the ALJ neither stated that he was crediting those doctors' opinions over Dr. Corben's opinion on this subject nor presented any reason for doing so—to the contrary, the ALJ afforded little weight to the consultants' opinions because they "did not adequately consider [Roberts's] subjective complaints." AR at 25.

Roberts is correct that the ALJ presented his decision generally to "not give[] great weight to" Dr. Corben's opinion only in the context of the ALJ's conclusion that Roberts was limited to sedentary work rather than the broader range of light work assessed by Dr. Corben and the state agency consultants. *See* AR at 25. Nothing in the ALJ's decision indicates that the ALJ was even aware of Dr. Corben's restriction of "reaching, handling, fingering, and feeling" to no more than three hours per day with breaks as needed. *See id.* at 453. That the ALJ afforded Dr. Corben limited weight as part of the ALJ's decision to "further *reduc[e]* the claimant's residual functional capacity to a range of sedentary word, and [to] assess[] *additional limitations*," is not a specific and legitimate reason to reject one of the limitations assessed by Dr. Corben. *See id.* at 25 (emphasis added).

The ALJ erred in failing to acknowledge, much less provide specific and legitimate reasons for rejecting, Dr. Corben's restrictions on Roberts's use of her hand.

### D.    Remand for Benefits Is Appropriate

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three

---

[5] It is also worth noting that the ALJ's decision was that Roberts's impairments do not prevent her from performing past work, *not* that she is not legally disabled because she has refused treatment for impairments that are otherwise disabling. If the ALJ had reached the latter conclusion, he would have been required to follow the procedures of Social Security Ruling 82-59, which he did not do.

conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose;[6] (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* at 1019−21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398−99 (9th Cir. 1988)).

A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *id.* at 1021, or where "there is a need to resolve conflicts and ambiguities," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014). A court may also remand for the limited purpose of determining when a claimant's disability began if that date is not clear from the credited-as-true opinion. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015). Outside of those circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule establishes that a claimant is disabled. *Garrison*, 759 F.3d at 1020.

Here, as discussed above, the ALJ erred in failing to credit Roberts's testimony and Dr. Corben's opinion regarding the limitations on Roberts's use of her hand. In arguing against application of the credit-as-true rule, the Commissioner contends that Roberts's conservative treatment and activities of daily living cast doubt on her testimony. Comm'r's Mot. at 12. It is

---

[6] As part of this first element, courts consider whether the record "is free from conflicts and ambiguities" and whether "whether the government has pointed to evidence in the record 'that the ALJ overlooked' and explained 'how that evidence casts into serious doubt' the claimant's claim to be disabled." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (quoting *Burrell*, 775 F.3d at 1141).

1   not clear what further treatment Roberts could have undertaken in light of her inability to undergo

2   surgery, and as discussed above, none of her reported activities conflict with either her or Dr.

3   Corben's assessment of her limitations.  The Court is also not persuaded that the opinions of the

4   nonexamining consultants warrant further proceedings.  The consulting doctors concluded that

5   there was insufficient medical evidence to support Dr. Corben's restrictions related to handling

6   and manipulation, *e.g.*, AR at 67, but as the ALJ noted in his decision, they failed to sufficiently

7   consider Roberts's complaints and lacked the benefit of later treatment records, including the MRI

8   that showed findings consistent with severe osteoarthritis, *see id.* at 25, 586.  Finally, the

9   Commissioner argues that the record is inconsistent in that Roberts alleged an onset date of

10  disability due to medical impairments in 2011 but stated that she stopped working in 2002 because

11  she was laid off.  Comm'r's Mot. at 12.  The Court discerns no inconsistency in a claimant ceasing

12  work for reasons unrelated to disability and, years later, becoming disabled.

13      Here, the Commissioner has not identified any legitimate reason why the record is

14  incomplete or further proceedings would be useful.  The ALJ failed to provide legally sufficient

15  reasons for rejecting: (1) Roberts's testimony that she experiences pain and debilitating swelling

16  after use of her hand for relatively short periods of time, AR at 40–41, 43; and (2) Dr. Corben's

17  opinion that Roberts could not use her hands for more than three hours in a day and would require

18  rest breaks to mitigate pain, *id.* at 453.  If either or both of those were taken as true, in conjunction

19  with Roberts's age and the ALJ's conclusion that she was restricted to sedentary work, the ALJ

20  would be required to find Roberts disabled on remand because she could not engage in at least

21  frequent fingering and manipulation as required by the need for typing in her past work.  *See* AR

22  at 26, 48–49; 20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).  The matter is therefore REMANDED

23  for an award of benefits.  *See Garrison*, 759 F.3d at 1019–21.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

24

## IV. CONCLUSION

For the reason discussed above, Roberts's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED to the Commissioner for an award of benefits consistent with this order. The Clerk is instructed to enter judgment accordingly and to close the file.

**IT IS SO ORDERED.**

Dated: March 30, 2018

JOSEPH C. SPERO
Chief Magistrate Judge